IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 25, 2005 Session

## STATE OF TENNESSEE v. JANIS SUE WATSON AND ALBERT EUGENE BROOKS

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 03CR297    James E. Beckner, Judge**

---

**No. E2004-02145-CCA-R3-CD - Filed March 20, 2006**

---

Janis Sue Watson and Albert Eugene Brooks, the co-defendants, were convicted of first degree premeditated murder and conspiracy to commit first degree murder, a Class A felony. Each co-defendant received concurrent sentences of life in prison and twenty years, respectively. The co-defendants' consolidated appeals address both the convictions and sentences. Having found no reversible error, the convictions and sentences of both co-defendants are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Greg Eichelman, District Public Defender, and Clifton Barnes, Assistant Public Defender, for the appellant, Janis Sue Watson.

Douglas L. Payne and Lewis Ricker, Greeneville, Tennessee, for the appellant, Albert Eugene Brooks.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; and Jared Effler, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The history of this case began with the co-defendants, Janis Sue Watson and Albert Eugene Brooks, becoming acquainted through an internet co-dependency support group. The co-defendants' relationship deepened, and they eventually met and became intimate. Their relationship came under scrutiny when defendant Watson's husband, Larry Watson, was murdered in the Watsons' Morristown home on October 30, 2002.

The co-defendants were charged by presentment with conspiracy to commit first degree murder and first degree premeditated murder. A jury returned guilty verdicts on both counts as to each defendant. The trial court sentenced each defendant to twenty years for conspiracy to commit first degree murder and to life in prison for first degree premeditated murder. The trial court then erroneously stated that the counts were merged. Tennessee Code Annotated section 39-12-106(c) and the Sentencing Commission Comments provide that upon conviction for conspiracy and the offense which was the object of the conspiracy, the two offenses are not merged. The judgment forms reflect that the two sentences for both defendants were to be served concurrently. It is these sentences that we affirm herein.

Of the issues presented on appeal by the co-defendants, five overlap sufficiently to consider in common:

(1) The evidence was insufficient to support the verdicts;
(2) The trial court erred in failing to suppress the results of the respective search warrants on the property of the co-defendants;
(3) The trial court erred in failing to grant a mistrial;
(4) The trial court erred in failing to instruct the jury on solicitation as a lesser-included offense; and
(5) The sentences for conspiracy to commit first degree murder were barred by Blakely v. Washington, 542 U.S. 296 (2004).

In addition, defendant Watson claims error by the trial court in imposing time limits on the opening and closing arguments and in the admission of certain evidence including the following:

a. telephone conversation transcripts between the two defendants;
b. alleged extraneous matter within the e-mails between the defendants;
c. Watson's handwritten entries in a book entitled, The Language of Letting Go;
d. map of the route between Knoxville, Tennessee, and Jackson, Mississippi;
e. correspondence and greeting cards exchanged by the defendants;
f. evidence of blood stains at the crime scene;
g. sign proclaiming "Welcome Home Jannie, I Love You;"
h. photographs of the deceased victim;
i. evidence of defendant Watson's bad check charges for impeachment purposes.

Factual Background

On October 30, 2002, at approximately 11:20 p.m., Officer Chris Hall of the Morristown Police Department, was dispatched to assist an ambulance call at 855 Spruce Street. Officer Hall saw the defendant Watson and a female neighbor coming out of the residence. When he entered the living room, he saw Larry Watson, the victim, lying on his back with his feet in a chair and his head on a pillow. There was blood on the right temple area of the victim and on the pillow. Officer Hall then began securing the house. After other officers arrived, Officer Hall re-entered the house. He found a spent shell casing in the chair where the victim's feet were. He also found a box of .22

caliber ammunition in the master bedroom. Officer Hall stated that the shower in the master bedroom had a scent of soap and shampoo as though it was recently used.

Sergeant Charles Letterman served as a patrol shift sergeant and chaplain for the Morristown Police Department. He also held part-time employment as a funeral director's assistant. On October 30, Sgt. Letterman had just finished a shift but was sent to the Watson residence as a chaplain. He arrived there at approximately 11:28 p.m. While searching for a weapon, he shined a light along the victim's left side. He noticed a dark pink discoloration on the lower side of the torso which he recognized as lividity. Later, Sgt. Letterman encountered defendant Watson in the garage area. She requested that the officers make sure no one was in the basement. After checking the basement, he spoke with defendant Watson again. She stated that she had been to the store for canning supplies and returned to find the victim in his present condition. She said she then went to a neighbor for help. Sgt. Letterman stated he was present at the police station later when Deputy Coroner Billy Love informed defendant Watson that an autopsy would be required. Sgt. Letterman testified that defendant Watson became very upset and said, "Neither of us wanted that, we had just talked about it this past Sunday, I plan on having Larry cremated just as soon as I can contact someone to do so."

Detective Brent Murphy of the Morristown Police Department went to the Watson residence to collect evidence and take photographs. Items taken at the crime scene and submitted to the Tennessee Bureau of Investigation (TBI) were the following: (1) box of .22 caliber ammunition; (2) door frame leading to basement; (3) shell casing found in chair where victim's feet rested; (4) swab from blood smear on kitchen countertop; (5) swab from blood smear from wood trim in hall bathroom; (6) swab from shower drain; and (7) swab from sink drain. A sample of the victim's blood was also submitted to the TBI laboratory.

Christian Newman was a detective sergeant for the Morristown Police Department who supervised the crimes against persons unit. Sgt. Newman arrived at the Watson residence at approximately 11:40 p.m. She was asked by defendant Watson if someone had broken into the house. Defendant Watson related her account of leaving the house around 10:30 p.m. to go to Food City and returning around 11:00 p.m. to find the victim in his present condition. Defendant Watson also asked three or four times about the victim's wallet. Sgt. Newman later drove to Food City by the most direct route and stated the distance was 1.7 miles which took four minutes and 18 seconds driving time at normal speed. Defendant Watson provided a Food City receipt with a time stamp of 22:56 (10:56 p.m.) for that evening.

Sgt. Newman described the door to the basement of the residence as having a free turning doorknob that did not lock. A deadbolt lock was above the doorknob. Pry marks were in evidence in the vicinity of the doorknob; however, the deadbolt was functional and the door was in proper working order. A crowbar was found in the bed of the victim's truck parked near the basement exterior door.

Sgt. Newman identified several pictures of items found at the residence. These included a bullet fragment in the floor of the room where the victim was found; a television set, spattered with

blood, located near the victim's body; a marble top table and a book also spattered with blood; and a blank form providing intent for cremation was found on the computer desk.  Defendant Watson told Sgt. Newman that she printed the form at the victim's request.

Sgt. Newman described finding a blood smear on a hallway closet door and on two throws on a couch near the victim's body.  Both throws were blood spattered.  She said she found towels, a shirt, and other items soaking in the washing machine with the machine turned off.

Sgt. Newman read transcripts of phone conversations originating from defendant Brooks at the Caddo Parish, Louisiana jail to defendant Watson.  The following are excerpts from the recorded phone conversations:

| | |
|---|---|
| Albert Brooks: | But they don't have any evidence, so he says. |
| Janis Watson: | Well, no.  What they have is emails that look really bad. |

* * * [1]

| | |
|---|---|
| Janis Watson: | Hmm, the way it looks in the emails is that, hmm, we plotted and hired a contractor. |
| Albert Brooks: | Uh-huh. |
| Janis Watson: | Hmm, one of the, uh, emails had one of the characters that was in the book, and it just so happened that I did have a page of the manuscript with W. – the initials W.M. on it. |
| Albert Brooks: | Uh-huh. |
| Janis Watson: | That explained away that one, except there's one thing in there where, umm, we were talking about my trips back and forth down there and you said something in the email that W.M. brought me half way one time or something.  Uh-huh. |
| Janis Watson: | And I'm like, you know, it's a character from the book.  And I'm like that it was role playing.  We – we did this back and forth like, you know, this is the way we were living it. |
| Albert Brooks: | Yes.   As – as characters. |
| Janis Watson: | And then we took that, and that's what I was coming up with the book with. |
| Albert Brooks: | Uh-huh. |
| Janis Watson: | Hmm, he said that there's talk of, umm, prison, gunshots, guns, umm, umm, electrocution. |
| Albert Brooks: | Uh-huh. |
| Janis Watson: | All mentioned in the book, and like I told him I said, Yeah.  I said, You know, and I tried to explain what the book was about, but it's really hard to explain to someone, look, look, these – there is different characters in the book, and all of these are going to be in a group setting inside a prison. |
| Albert Brooks: | Uh-huh. |

---

[1] * * * indicates a break in sequence within a conversation.

Janis Watson:     So he wants to see the entire book.  And I told him, Well, you know, some of it was still in the house.  Some of it was emails and never, you know, materialized, and what I have is – is little, but some characters, you know, that are in the book, that are mentioned in the emails, are in the book.  I mean they are.

Albert Brooks:    And some just never developed.

Janis Watson:     Right, you know, umm, these were all taken in like September, uh, the 24th I think.  Uh-huh.  Was the date on this one?  Uh-huh.  There was – I'm sorry.

Janis Watson:     Was the date on this one, hmm, there was part – was one part in there like, umm, my way is just to walk in, pop him in the head and you know.

Albert Brooks:    Uh-huh.

Janis Watson:     That type of stuff.

Albert Brooks:    I remember that.

Janis Watson:     Okay.  It all looks bad.

Albert Brooks:    Yeah.

Janis Watson:     You know, even – even me reading it, it looks bad, and when you get them to read them, you're going to say, okay, I could see how that would lead to this.

Albert Brooks:    Yeah.

Janis Watson:     It makes part of the book.

Albert Brooks:    But we – it – it maintains – It's all part of the book.  It was all in character.

Janis Watson:     Right.  Right.

Albert Brooks:    Uh-huh.  Well, you know, we can speak things into being.  We can speak it into – we can speak it to be thrown out.

Janis Watson:     Oh, sure.  Sure.  You know, but no one except you know you and I can walk up there and say, Oh, yeah.  I know for a fact that this is part of the book because they talked to me about it.  Larry's gone, you know.  He can't say, Well, yeah.  I knew about that.

The following was from a later recorded conversation originating from Caddo Parish Jail:

Janis Watson:     Hmm, I'm sorry.  I wish I could just make it all go away, you know.

Albert Brooks:    I wish it had never – I wish it had all never happened.

Janis Watson:     I.

Albert Brooks:    But, yeah, we, uh, Yeah.  I agree with you.  I wish it could all just go away, but I wish it had never happened.

On cross-examination, Sgt. Newman stated that due to an improper collection technique, the gunshot residue test could not be performed on defendant Watson.  Sgt. Newman testified that she

had verified that defendant Brooks was at work in Shreveport, Louisiana, until 5:00 p.m. on October 30, 2002.

Detective Mark Campbell of the Morristown Police Department talked with defendant Watson after she was transported to the police station. She stated that she had had an internet relationship and had moved to Shreveport, Louisiana. The victim had retrieved her in February of 2002, and she said that since then they had experienced the best months of their relationship. Defendant Watson provided a written statement concerning the events of that evening. In her statement, defendant Watson said that the victim arrived home about 6:30 p.m. The victim drank a Dickel and Coke mixed drink and then ate dinner. Later she said the victim had gone to sleep on the floor. She covered the victim with a throw and woke him to tell him she was going to the store for canning supplies. She described arriving at Food City about 11:00 p.m. and then returning straight home. Upon her return she noticed that the victim was not snoring. Defendant Watson said she "saw something but I'm not sure what I saw close to his forehead." She then said she ran down the street.

Detective Campbell had obtained the Food City security video which showed defendant Watson entering the store on October 30 at 22:43:50, or almost 10:44 p.m.

Anthony Guida was formerly employed by the Knoxville Police Department as an investigator with the Internet Crimes Unit. He was accepted by the trial court as an expert in computer forensic analysis. Mr. Guida had performed forensic analysis on the hard drive of the computer seized at the Watson residence. Numerous email communications were read to the jury and copies entered into evidence.

One undated message was a communication between two unidentified individuals and contained the following excerpts:

> I've sent you money to buy pills and potions and hire contractors to help you. No more. . . . I saw my life, my hopes, my dream dissolve into thin air on what was supposed to be the most romantic day of the year. I'm entitled to resolution or closure. It's been eight months too long in coming. I've paid the storage for next month again. He has no room to bitch. It isn't costing him a damn thing. I've got one coupon left for December. I won't start 2003 having that storage unless you're here, by Halloween, huh? So tell me, is Halloween going to be just another trick or is it going to be a treat?

The following email message was sent from defendant Brooks to defendant Watson on June 10, 2001:

> As the saying goes, sweetheart, this too shall pass. . . In spite of the trust and confidence I have in him, in spite of the high degree of suspicion I have for him, I feel like all this is on the downhill slide ending. Well, you have your work cut out for you. Todd and I got all the bushes pulled up out of the front bed. Todd said he

sure hoped you knew what you were doing. I just smiled at him and said you did. Sure looks different out there.

Now, as you told me the other night, last night, baby quit getting rid of your stuff. Yes. It's your stuff and yes, you can do with it as you please. But I want you to know you can bring any and everything you want, and we'll work together on what we use. True, I don't want us bringing bad juju, but we can't both get rid of everything we own and start. The no bad juju was mainly symbolic for the wedding rings anyway. We're stronger and smarter than most of the juju out there anyway. The time will come when we can say Larry who. With time, he will become out of sight and out of mind. With the happiness in your heart, you must feel the happiness in my heart knowing you are almost here. I love you – or love you.

The following excerpt is from a message from defendant Brooks to defendant Watson dated September 19, 2002:

Of course, you know, if it had been left up to me, if I had known, he would have been dead a year ago, but we won't flog that horse. Like I said, I had quit eyeballing ditches and culverts and other hidey holes. I figured your contractor was the best plan yet, so I quit making my plans. Your contractor may be your best bet in that it at least removes you from direct personal contact. I really and truly don't think you have the guts to do it outright. Not intended as a slam. Oh, sure. You could do it with his meds and shit, but that ain't working out either; is it?

I think the thing that pisses me off the worst is the your lack of positive, definitive plan of action. How many months ago did I try to convince you to let him bring the fight here? No. You had to do it yourself and nothing would do but that it be by natural causes. You've made several other attempts. A little more desperate than the last. Now, you've hired a contractor and given him free reign of how and when.

. . . .

Out of all of the above, none of it is meant to tell you to or not to come home. I want you to make a plan and stick to it. You've got both of us riding an emotional roller coaster, and I told you some time ago I don't like nor do roller coasters. Kill him or don't. Come home or don't. But by God, make a plan and stick to it in as much as is possible under the circumstances, but get us off this emotional roller coaster. You're the only one who can.

A message dated September 22, 2002, from defendant Brooks to defendant Watson gave detailed instructions on using electrical extension cords as a means of electrocution. The following excerpt is the initial part of the message and is representative of the remainder:

I may have to touch this after all. Why? I'm trying to understand. Okay. One last time, pay attention. Go get an extension cord right now. I'll wait. Got one? Okay. Put one end of it in each hand. Got that? Okay. One end of the cord has a male plug; that's the end with the prongs that plug into the wall receptacle. The other end has the female ends, the slots. With me so far? Good. The female end with the slots is the one you cut off.

Now comes the complicated part. Is the cord you have a two wire, like a lamp cord or a three wire inside of a colored jacket? There is even three wire cords that don't have an exterior jacket over at all. Look at the male end. Two prongs or three? If it's a two wire cord, like what's on a lamp, do not plug it in yet. Cut the female end off. Grab the two wires and pull them apart for a length of six or eight inches. Then strip an inch or so of insulation off each one leaving just bare wire. It will be stranded, many smaller wires. Grab these between thumb and forefinger and give them a twist to wind them all together. Don't twist both wires together. Do one at a time, keeping the two individual conductors separate.

Now, with the two wires touching you – or touching together, you plug the male end into the wall and apply the bare ends repeatedly as necessary until the desired effect is achieved. Understand all that? Any questions?

The following excerpts are from a September 24, 2002, email from defendant Brooks to defendant Watson:

It wasn't any type of experiment. It was a mission. A goal that I'm still doing my damnedest to achieve. So is the anger going to be directed at me? What price is this all going to carry, because if there's one thing that this life has taught me well, everything carries a price. Nothing is free. Not even the space we take up. Number one, the anger.

Number two, the stand on me never asking you to come to this state again. We've discussed this at length.

Number three, the statement – the statement about me getting there on my own, and number four, a gut feeling. Okay. Maybe it's not an experiment on your part. Maybe it is a mission, but you're still trying to prove, to drive home a point. Your point? Your goal is costing all of us. The anger you perceive. I don't kill for a living. I have to have a pretty damn good reason to even contemplate it. Sure. I get pissed off. That's one reason I don't keep a gun on me. Society has rules against popping the assholes in Wal-Mart or anywhere else for that matter. To do this thing, I've got to have a head of steam up. I've got to as you say, have talked myself mad. My personal preference is to walk in, pop him in the head and walk out. Simple, direct, and to the point, but that won't suit your needs. You need the window dressing. That complicates matters. Not coming back to Tennessee. I'm not real

-8-

anxious to go anywhere, but I might be a suspect in something and you can be sure if someone knows my name, it will come up sooner or later.

Here's a question for you. If we take matters into our hands and do this thing, where then is motivation to not rat you out? He doesn't have any at that point. At least when he was going to be an active participant, you had your all's mutual involvement to motivate him to not rat you out. Remember what I've said about trust no one? At least no further than you can throw them. In any event, if he dies there, you're going to be the foremost primary suspect. That's just the way cops think. However, if I read this new plan right, you'll be lying dead next to him and someone may still whisper my name. I'd certainly be a qualified suspect. The wronged, jilted, vengeful lover. Happens all the time.

The anger, the stand, the statement, the gut. Let me lay my cards on the table to you. You know I'm prone to speak my mind. Let the chips fall and do damage control afterwards. It is my feeling, my observation, that you've managed to get in over your head in a situation you are unable to extricate yourself from. And now you're having to cast about for someone to come take care of your problem for you, to finish what you started. You've got a goal, but you've come to realize you can't accomplish it by yourself. You started something you can't finish and you want it finished in your time and in your way.

Those that you would involve in this have their own priorities too. I have to protect myself just as – just as does your contractor or W.M. W.M. doesn't want to go back. I don't want to go period. If I'm to do this, I will – total and absolute control of it – I will have total and absolute control of it.

\* \* \* [2]

There is – there is no statute of limitations on murder. This is not self defense we're talking about here. It qualifies as first degree premeditated.

. . . .

Is it safe discussing this in email? Probably not. Emails can be intercepted. Phones can be tapped and recorded as you so well have personal experience with. The only safe is face to face, but we don't have that luxury; do we?

The price you'll be paying. Is it any more or less than the price of the risk I'll be taking to come to do this thing? I feel like I'm paying a price to make this over for you so we can be together, and I'm not talking dollars. That's his thing. I'm talking risks. Risks and emotional involvement. Is mine any less a contribution than yours? Can you deal with and survive standing there and watching me do him?

---

[2] \* \* \* indicates a break in sequence within the same email message.

Because you'll be right by my side the whole time. Can you live with the fact that the man you want to spend the rest of your life with did this in cold blood? Will it always be in the back of your mind that I might be capable of doing it to you? Just like lies, it gets easier after the first one.

I love you, sweetie, and I want this over with as much as you do. How far are we willing to go? What are we willing to do to make it so? Can we pay the price? But then can we pay the price not to?

The following was a message dated September 30, 2002, from defendant Watson to defendant Brooks:

He's who I plan to call when it all happens. Do you see this as a night or daytime thing? Weekday or weekend? The dreams, scenarios that play in my mind, it's down toward dusk. For what day, it doesn't really have a bearing on it except that Sunday – bad. My hypocrisy does have limits. Besides, someone might pop in. Talking lethal injection.

The following message was from defendant Brooks to defendant Watson on October 15, 2002:

We were talking about the .22. The .38 would be more of a stopping power gun like for a self defense or suicide. The .22 is for up close and personal work. Yeah. Seems to be the one constant. Plans changing.

The following message was from defendant Brooks to defendant Watson on October 27, 2002:

For old times sake, write me a love letter. I need it. Roses are red, violets are blue, make him dead, I love you. Roses are red, violets are blue, hit him in the head, I love you. Roses are red, violets are blue, sew him up in the bed, I love you. You, me, this chair, right here. Right now.

The following message from defendant Brooks to defendant Watson was sent October 28, 2002:

This is going to happen this week. It has to. You got that right.

On cross-examination, Mr. Guida said he found no indications of a book being written on defendant Watson's hard drive. He stated that he did not discover any introduction, character development, or a story line.

Robert Daniel Royse, a forensic scientist specializing in firearms and tool mark identification for the TBI, was accepted by the court as an expert in his field. He stated that five bullets recovered from the victim had been fired from one firearm. A sixth bullet was too mutilated to be conclusive as to the firearm. He further stated that all the bullets and bullet fragments recovered were consistent with the type contained in the box of .22 caliber ammunition found at the Watson residence.

Melanie Carlisle, a forensic scientist with the TBI, stated that she performed a blood alcohol analysis of the victim and found only a trace of alcohol, which is classified as negative by the TBI.

Dr. Mike Turbeville, a TBI agent, testified as an expert in serology and DNA analysis. He stated that the blood sample taken from the Watsons' kitchen counter was consistent with the victim's blood and that the probability of the DNA profile matching a Caucasian other than the victim was one in fifteen and a half million. The blood found on the Watsons' bathroom door rendered a probability in excess of the world population that it was the victim's blood.

Dr. Cleland Blake is a pathologist who serves as the Assistant Chief Medical Examiner for the State of Tennessee. His autopsy of the victim revealed the cause of death to be six .22 caliber gunshot wounds to the right side of the head. From the stippling observed on the victim, he estimated that the muzzle was within twelve to fifteen inches from the victim's head when fired. Dr. Blake estimated that the victim had died within one to one and a half hours after having eaten. He also stated that lividity appears within an hour and a half to two hours after death.

Anthony Acevedo, an employee of I.D.T. Corporation, testified concerning the records related to a prepaid calling card. Calling history pertaining to the card was referred to in testimony, and the history was apparently made an exhibit. However, the exhibit is not included in the record and the testimony is not sufficiently clear to determine the content.

Linda Bates, an employee with BellSouth, testified concerning three phone calls made on October 30, 2002. At 4:46 p.m., a call was placed to an I.D.T. prepaid calling card from the Watson residence and had a duration of forty-two minutes. Defendant Brooks admitted receiving this call.

At 6:16 p.m., a call was made from (865)919-8950 (an unidentified number) to the Watson residence, lasting one minute. At 7:29 a.m., a call was made from (423)585-5983 (an unidentified number) to the Watson residence, lasting two minutes.

Bud Blake, an employee of Cingular Wireless, testified that a call was placed from a mobile phone registered to the victim at 9:20 p.m. on October 30. The number called was Geraldine Cozart's, the mother of defendant Watson. The duration was six minutes.

Jay Long, a detective with Caddo Parish Sheriff's Office, testified that he executed a search warrant at defendant Brooks' residence in Shreveport on February 18, 2003. He stated that defendant Watson was present at the residence on that date.

Scottie Ferguson, a TBI criminal investigator, traveled to Shreveport to assist in the execution of the search warrant at defendant Brooks' residence and also to interview defendant Brooks. Agent Ferguson had, prior to that time, read the emails taken from defendant Watson's computer. When defendant Brooks was confronted with the content of the emails with defendant Watson, he stated that they were intended for writing two books, a crime novel and one on defendant Watson's life.

Defendant Brooks stated that he and defendant Watson talked every two or three weeks. The defendant said he had not talked with her for two weeks before the murder.

Among the items found in the search of defendant Brooks' residence were a Western Union receipt for $220 sent by the defendant to Janis Eddington;[3] a check register showing $500 "for Janis"; a cancelled check copy made to cash, "for Janis" in the sum of $500. Also seized was a book entitled The Language of Letting Go. Numerous handwritten notations from this book were read and made exhibits. Agent Ferguson stated that he had confirmed that defendant Brooks was at work in Shreveport on October 30, 2002.

Mark Fargerson was employed as an investigator with the Caddo Parish District Attorney's Office. Investigator Fargerson performed a forensic analysis on defendant Brooks' computer. Three documents taken from defendant Brooks' computer were read to the jury. The first was an email message previously read into evidence as found on defendant Watson's computer. The second, a letter from defendant Brooks, referring to the enclosure of a $1000 retainer check, was addressed to a lawyer in Morristown. The letter asked the attorney to represent defendant Watson concerning the victim's estate. The third document was an email from ABC Distributing to Jannie Brooks at defendant Brooks' email address. The message acknowledged an order of merchandise.

Ledonna Beaty was the daughter of the victim by a prior marriage. She testified as to her familiarity with defendant Watson's handwriting and identified numerous exhibits as being written by defendant Watson. A stipulation was entered that the notations contained in The Language of Letting Go were made by defendant Watson. Mrs. Beaty was the last witness for the State's proof in chief.

Tom Lowe was a neighbor to Larry and Janis Watson. He testified that defendant Watson came to their door at 11:15 p.m. on October 30 and appeared to be in a state of panic. She told the Lowes, "Something's wrong with Larry." Mr. Lowe's wife, Audrey, a nurse, went with defendant Watson to the residence while Mr. Lowe called 9-1-1. Mr. Lowe stated that the victim's body was still warm at the time.

Audrey Lowe described finding the victim in the floor and attempting, without success, to discern a pulse or breathing. She attempted CPR until she heard gurgling and saw blood come from the victim's mouth. Defendant Watson had apparently fainted and was tended to by Mr. Lowe. Mrs. Lowe confirmed that there was warmth in the victim's body. Mrs. Lowe had told Sgt. Newman that her guess was that the victim had been dead an hour or hour and a half.

Sgt. Christian Newman was recalled and testified that she received four credit cards belonging to defendant Watson and/or Larry Watson on November 7, 2002. These were found at a service station in Knoxville. A check of the cards revealed they were valid from October 30 until the date of discovery; however, no use of the cards had occurred during that period.

---

[3] A former marital name of defendant Watson.

Jack Ray Cozart, defendant Watson's brother, testified that on October 30, 2002, he was living with his mother, Geraldine Cozart. He had, prior to October 30, done painting work at the Watson residence. He stated that defendant Watson called him at 9:00 to 9:30 p.m. on the night of October 30. He stated that he heard a male voice in the background and that it was not from a television or radio. He could not identify the voice.

Defendant Watson testified in her own behalf. She stated that Larry Watson was her fifth husband. They had married in 1994 but had dated for ten years previously. She had worked in factories but primarily as an alcohol and drug counselor. She explained that the book, Language of Letting Go, was a self-help book that she used in her meditations. She said she sometimes made notations within its pages.

Defendant Watson said she met defendant Brooks through an online support group, Co-dependents Anonymous, in 1999. She first met defendant Brooks physically in Lenoir City for dinner. They became intimate that evening. She said she was, at that time, separated from her husband. After meeting defendant Brooks on other occasions, she moved to his home in Shreveport in September 2001.

Defendant Watson stated that she had written poetry, short stories, self-help articles, and ventured into fiction. She said defendant Brooks helped her develop characters and stories. Defendant Watson read excerpts from writings that she said were the makings of a novel that she never finished. One vignette involved an electrocution with an electrical cord. She attributed the idea for this to defendant Brooks. She said she moved many of her possessions to Shreveport and placed some in storage there. On February 14, 2002, the victim came and took her back to Morristown in a mutual attempt to reconcile. She said she loved both the victim and defendant Brooks, but the victim needed her because he was sick.

Defendant Watson recounted the events of the night of October 30 as to how she had found the victim dead after returning from the store. She denied shooting the victim or knowing who did. She said that she received $5000 from the victim's estate. She moved to defendant Brooks' residence on December 19, 2002.

On cross-examination, the co-defendant was asked when she printed the portions which she had introduced as the book she was writing. She could not provide an answer but said these book extracts were produced on her computer. She admitted that defendant Brooks had placed a handgun in the console of her car in 2001. She also agreed that she had talked by telephone with defendant Brooks on the date of the victim's murder.

After the conclusion of defendant Watson's testimony, defendant Brooks presented his proof. Daniel Peaden, a co-worker of defendant Brooks testified that defendant Brooks was at work on October 30, 2002.

-13-

Jason Brooks, defendant Brooks' son, stated he was aware that his father had allowed defendant Watson to take a small handgun. He stated that it was returned in about six weeks and was now in his possession. He described it as a Bursa, semi-automatic compact, .380 caliber.

Defendant Brooks testified that he originally met defendant Watson through a co-dependency network and eventually they started emailing each other directly. This led to a personal contact first made in Lenoir City. Defendant Watson had moved to his residence in July or August of 2001. He placed a .380 handgun in her car when she returned to Tennessee, and he reclaimed the weapon in December of 2001. Defendant Brooks stated that emails dealing with electrocution, contractors, head shots, and other criminal acts were results of his collaboration with defendant Watson's efforts to write a crime novel. Defendant Brooks said he never saw defendant Watson's proposed manuscript until after the discovery process in this criminal action.

Defendant Brooks recalled the forty-two-minute phone call he received from the defendant Watson on October 30, 2002. He stated it was concerning her plans to retrieve her property from the storage unit. He said that he had to place her on hold during the call to answer work-related calls.

Defendant Brooks stated that the money sent to defendant Watson were proceeds from items he had sold for her. He characterized the retainer fee to the attorney as a loan to defendant Watson. He denied any involvement in the death of the victim.

Three character witnesses from the Shreveport area, Gilbert Metcalf, Pat Joiner, and Billy Lawrence, testified as to defendant Brooks' good reputation in the community where they lived. Percy Sharp, defendant Brooks' supervisor, confirmed that defendant Brooks was at work in Shreveport on October 30, 2002.

The State called two rebuttal witnesses. Traci Dolese, a former co-worker with defendant Watson, stated that defendant Watson had told her she kept a "pretty little gun" under her car seat. The time period was in 1999-2000. Ms. Dolese did not see the gun.

Anthony Guida testified that he had used search words taken from the purported manuscript produced by defendant Watson and performed another search of the computer hard drive. No trace of the manuscript was found.

Sufficiency

The co-defendants contend that the evidence was insufficient to support the convictions for first degree murder and conspiracy to commit first degree murder. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R.

App. P. 13(e). The same standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The State contended at trial that although defendant Brooks was not present at the murder, nevertheless, he was guilty of first degree murder under the theory of criminal responsibility. Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." T.C.A. § 39-11-401 (1997), Sentencing Commission Comments. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See id. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The jury was instructed on the elements of the charged offenses as well as on criminal responsibility for the conduct of another individual. Ultimately the jury convicted both defendants of first degree premeditated murder and conspiracy to commit first degree murder. To obtain a conviction for first degree premeditated murder, the State had to show "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (1997). For the purposes of this crime, "premeditation" is an act done after the exercise of reflection and judgment. "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (1997). "'Intentional' refers to a person who acts intentionally with respect to the nature of

the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a) (1997).

Defendant Watson maintains that no proof was adduced connecting her to the murder of her husband. In conformance with our obligation, we have reviewed the evidence in the light most favorable to the State and concluded therefrom that sufficient evidence does support defendant Watson's conviction for first degree premeditated murder.

Initially we observe that defendant Watson's version of events surrounding the victim's last hours is inconsistent with the physical evidence. Lividity in the victim's lower torso was detected by Sergeant Letterman shortly after his arrival at 11:28 p.m. Dr. Blake testified that lividity appears from one and a half to two hours after death. This indicates a time of death no later than 9:30 p.m. to 10:00 p.m., but possibly earlier. According to defendant Watson, the victim arrived home at 6:30 p.m., had a mixed drink, and then ate supper. Dr. Blake's autopsy revealed undigested food in the victim's stomach which enabled Dr. Blake to estimate that the victim had died within an hour and a half of eating. This evidence points to a time of death even earlier than 9:30 or 10:00 p.m. The Food City video camera recorded defendant Watson's entry there at 10:44 p.m. The receipt issued her bore a time of 10:56 p.m. Sgt. Newman had timed the duration of a direct drive from the Watson residence to Food City at four minutes, eighteen seconds. The physical evidence supports a conclusion that the victim had been shot six times in the head prior to defendant Watson's departure for Food City.

The victim's blood was found on the kitchen countertop and on a hall bathroom door. It is a reasonable assumption that these smears were left by the assailant rather than the inert victim. Clothes and towels were found soaking in the washing machine, and there were indications that the shower in the master bedroom had been recently used. The jury could reasonably conclude that the assailant had been spattered by the victim's blood and had engaged in cleaning up. Although no murder weapon was found, the fatal bullets were consistent with .22 caliber ammunition found in the residence.

Defendant Watson had insisted that the investigating officers check the basement for an intruder. The officers observed ineffectual pry marks on the door from the basement. The marks were made in the area of the non-locking door knob, and the dead bolt was still intact and serviceable. A crowbar was found in the victim's truck parked outside the basement. Defendant Watson also expressed concern for the victim's wallet which was not located. On November 7, 2002, Sgt. Newman received credit cards issued in the victim's and defendant Watson's names that were found at a Knoxville service station. The cards were valid but had not been used since the victim's death. This cumulative circumstantial evidence could have been justifiably construed by the jury as an attempt to create the impression of a break-in, murder, and burglary. The jury, in light of all the proof, could have reasonably concluded that defendant Watson's trip to Food City was staged to produce an alibi for herself and a convenient window of opportunity for a hypothetical intruder.

-16-

The jury also had for its consideration the content of the email messages between the co-defendants. These can be fairly characterized as an ongoing discussion of various methods of murder, one of which was by a .22 caliber weapon for "up close and personal work." The email messages reveal a sense of urgency and finality as the date of October 30, 2002, approached. Defendant Watson's contention that these sinister messages were merely steps in the formulation of a book was rejected by the jury. This rejection was warranted by the testimony of the State's forensic expert that no manuscript appeared on defendant Watson's hard drive, contrary to her testimony. The jury was entitled to interpret the emails as evidence of the motive, intent, the method, and even the selected date for the execution of the victim by defendant Watson with the active, albeit absent, aid of her encouraging collaborator, defendant Brooks.

In light of the foregoing, we affirm defendant Watson's conviction for first degree premeditated murder.

Defendant Watson makes no argument challenging the conviction for conspiracy to commit first degree murder in her brief and has effectively waived that issue. Tenn. Ct. Crim. App. R. 10(b).

We next consider defendant Brooks' challenge to the sufficiency of the evidence. The record is replete with email messages between the co-defendants explicitly discussing murder. Various methods including the use of a contractor, firearms, poisons, and electrocution were considered and discussed. The messages strongly suggest that Larry Watson was the intended victim. On September 19, the defendant urged the co-defendant to "kill him or don't" but to make a plan and stick with it. On October 15, fifteen days before the murder, defendant Brooks sent a message stating that a ".22 is for up close and personal work." On October 27, three days before the murder, defendant Brooks sent a message to defendant Watson that poetically implored: "Roses are red, violets are blue, make him dead, I love you." On October 28, two days before the murder, the defendant emailed the co-defendant, "This is going to happen this week. It has to. You got that right." Defendant Brooks and defendant Watson conducted a forty-two-minute phone conversation on the day of the murder.

The co-defendants maintained that their exchanges were merely a collaboration in the development of a crime novel. As stated earlier, this explanation was obviously rejected by the jury. The evidence established that defendant Brooks knew of the impending murder, actively contributed to its planning, encouraged defendant Watson to pursue the plan and afterwards the co-defendants cohabited. These acts were sufficient for the jury to find defendant Brooks guilty of first degree premeditated murder under a theory of criminal responsibility.

Defendant Brooks also challenges the sufficiency of the evidence supporting his conviction for conspiracy to commit first degree murder. The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a) (1997). It is also required that "an overt act in pursuance of such conspiracy is alleged and

proved to have been done by the person or by another with whom the person conspired."  T.C.A. § 39-12-103(d) (1997).

The essential feature of the crime of conspiracy is the accord - the agreement to accomplish a criminal or unlawful act.  See State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998); State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989).  A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence.  See Pike, 978 S.W.2d at 915; State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement").  "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise.  Conspiracy implies concert of design and not participation in every detail of execution."  Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The evidence in this cause supporting a conspiracy is derived primarily from the correspondence of the co-defendants Brooks and Watson,  supported by surrounding events.  The evidence, in the light most favorable to the State, established that defendant Brooks and defendant Watson were lovers who mutually desired the elimination of the victim.  They discussed various methods of murder, one of which was with a .22 caliber weapon.  The tone of their correspondence intensified as October 30, 2002, approached.  The co-defendants conversed by phone for forty-two minutes on the day of the victim's murder.  The motives of a shared life together and possible financial gain for defendant Watson were present.  Their planning and mutual desire were brought to fruition on October 30, 2002, by the murder of Larry Watson.  The clandestine nature of conspiracy is seldom so starkly exposed as in this instance by defendant Brooks' messages to defendant Watson.  Defendant Brooks' conviction for conspiracy to commit first degree murder was supported by the evidence beyond a reasonable doubt.

Search Warrants

Defendant Watson contends that all evidence divulged under a search warrant on the contents of her computer should have been suppressed for lack of compliance with Tennessee Rule of Criminal Procedure 41.

Defendant Watson's computer was seized on October 31, 2002, pursuant to a consent to search signed by defendant Watson.  The consent form stated, "The above named Officer(s) are authorized by me to take from my premises and/or vehicle any letters, papers, materials or other property which they may desire."  The form further provided that consent would be "effective until such time as their investigation is complete."  After its seizure, the computer was retained in a secure area of the Morristown Police Department.

On November 8, 2002, Sgt. Newman obtained a search warrant for the computer and its components to be sent to a forensics team in Knoxville for examination.  In particular, the warrant

sought evidence of email transactions or chat room contacts defendant Watson may have had with a male she was believed to have been in contact with, as well as web sites visited.

According to Sgt. Newman, she could not locate defendant Watson to serve the search warrant. The police had been notified by an attorney, Denise Terry, that she represented defendant Watson and instructed police not to contact the client. Terry accepted service of the search warrant.

On November 11, 2002, Sgt. Newman attempted to make a return of the warrant to the issuing judge. The judge instructed her to make a return after the forensics examination. Due to the delay in completing the hard drive analysis, the actual return was not made until January 24, 2003.

The trial judge's order overruling the defendant's motions to suppress found as follows:

## ORDER

The issue to be decided is whether the E Mails form [sic] the computers of the defendants should be suppressed.

After the death of Larry Watson, the husband of Janis Watson, a valid search of the premises of Janis Watson was conducted pursuant to the written consent to search executed by Janis Watson.

These are the same premises where the crime of first degree murder is alleged to have occurred.

The search "papers" do not specify a computer but the personal computer of Janis Watson was seized.

The question regarding the seizure of the computer is whether it was obvious as possible evidence of the crime of murder.

At the time of the seizure the investigating detectives had information of a romantic relationship between Janis Watson and defendant Albert Brooks, who was living in another state, and of possible correspondence by E Mail.

That was the reason the computer was seized, and is justification for same.

The detective then obtained a valid search warrant for the contents of the computer from the General Sessions Judge in Hamblen County.

Criminal Rule of Procedure 41(d) requires that after due execution of a search warrant (within 5 days from issuance) the return be made promptly to the issuing magistrate.

This rule cannot account for the search of the contents of a computer. This search took weeks of looking at thousands of files in the computer.

To the credit of the detective, she attempted to within less than 5 days make a return to the magistrate who refused the return until the search was completed.

When the search was completed it reveled [sic] numerous E Mail transmissions which from their pattern and substance bear a strong indicia of reliability as being between Janis Watson and Albert Brooks.

The only logical and reasonable conclusion this court can make is that Rule 41 has been complied with and that the search and seizure of Janis Watson's computer is valid in all aspects.

It then follows that there was probable cause to seize and search the personal computer of Albert Brooks.

Therefore, the E Mail transmissions from both computers are admissible subject to qualification of the person who extracted them from the computer.

This 25 day of May, 2004.

Defendant Watson's objections are all concerning the search warrant and are based on alleged noncompliance with Rule 41 of Tennessee Rules of Criminal Procedure. The issues posed are threefold:

1. Failure to perform proper service;
2. Failure to make prompt return; and
3. Lack of specificity of information sought within the computer.

"When reviewing a trial court's ruling on a motion to suppress, '[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). When a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the record de novo without a presumption of correctness. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000).

Defendant Watson's objections on the issue of suppression all presuppose that a search warrant was required prior to analysis of the computer hard drive. We respectfully disagree.

Defendant Watson, on October 31, 2002, signed a "Consent To Search" form authorizing officers to search her residence and remove "any letters, papers, materials or other property which they may desire." A consent to search is an exception to the normal requirement of a search warrant. Schneckloth v. Bustamonte, 412 U.S. 218, 248, 93 S. Ct. 2041, 2059 (1973). The consent must be voluntary and without coercion. State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998). Evidence seized in the search will not be admissible if the search exceeds the scope of the consent given. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002).

As found by the trial judge, at the time of the seizure of the computer, the officers had knowledge of a relationship between the co-defendants and possible correspondence through email messages. A suspect's consent is measured by the standard of objective reasonableness. Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803 (1991). Defendant Watson knew at the time of her consent that an investigation of murder was occurring. Within that frame of knowledge, she consented to the officers' removal of letters, papers, materials, or other property. Although a computer is not specifically mentioned, the emails it contained are technological equivalents of letters, and it is certainly material in the common sense of the word. "The scope of a search is generally defined by its expressed object." Id. At 251, 111 S. Ct. at 1804. The object of this search was to uncover evidence concerning the victim's murder.

-20-

Search and seizure law pertaining to new technologies such as computers is evolving and to date, there is a dearth of case law in Tennessee on the subject. There can be no doubt that information stored in a private personal computer is subject to Fourth Amendment protection. However, the touchstone of the Fourth Amendment remains reasonableness. Katz v. United States, 389 U.S. 347, 359, 88 S. Ct. 507, 515 (1967). In the context of the instant investigation, had the computer been instead a box marked correspondence, its seizure and subsequent examination would have been reasonable and expected. The computer was seized for the information it contained, and it was reasonably foreseeable that an examination of its contents would follow. The consent form contained no limitations to such an analysis. We conclude that the consent given by defendant Watson was sufficiently broad to include the seizure of the computer, and it was logically foreseeable that its contents would be subject to examination.

Nevertheless, the State, operating presumptively out of a perceived need or an abundance of caution, sought and obtained a search warrant for the examination of the computer contents. Defendant Watson contends that service of the warrant on her then acting attorney was inadequate pursuant to Tennessee Rule of Criminal Procedure 41(d), which pertinent provision reads as follows:

> The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at a place from which the property was taken.

The intent of Rule 41 is "'to secure the citizen against carelessness and abuse in the issuance and execution of search warrants.'" State v. Coffee, 54 S.W.3d 231, 233 (Tenn. 2001) (quoting Talley v. State, 345 S.W.2d 867, 869 (Tenn. 1961)). The purpose of providing notice to the owner of seized property is to notify the owner of the source of the seizure so that the owner can pursue available remedies for its return. City of West Covina v. Perkins, 525 U.S. 234, 240; 119 S. Ct. 678, 681 (1999). However, "the prevailing view is that noncompliance with . . . [notice] does not compel exclusion of the evidence obtained pursuant to the warrant, at least absent prejudice to the defendant or a deliberate disregard of the notice provision." 2 Wayne R. LaFave, Search and Seizure, § 4.12(b) (4th ed. 2004) (footnote omitted).

In this instance, the property had previously been seized and was in the possession of the Morristown Police. Notice was not deliberately disregarded but, instead, was served on the then recognized counsel for defendant Watson. In our view, defendant Watson suffered no prejudice; the service utilized was not an avoidance of process and constituted adequate notice to the property owner.

The contention that the return was not timely filed within five days of issuance is unavailing. The return upon a search warrant is a ministerial function and does not affect the validity of the warrant or its execution. State v. Hilliard, 906 S.W.2d 466, 468 (Tenn. Crim. App. 1995).

The issue of lack of specificity is also lacking in merit. The warrant sought email transmissions, chat room contacts, and web sites visited by the user. We conclude that the object

-21-

of the search was sufficiently described while acknowledging as a matter of practicality, that all manner of material may be exposed by the examination. This unavoidable consequence does not negate the fact that specific data was the object of the search.

In summary we conclude that, while unnecessary, the search warrant and its execution withstand defendant Watson's challenge. The motion to suppress was properly denied.

Defendant Brooks challenges the search warrant issued by the First Judicial Court of Caddo Parish, Louisiana, alleging the warrant failed to:
1. State the particular grounds of the application for the warrant;
2. Describe the premises to be searched with sufficient particularity; and
3. Describe the property to be seized with sufficient particularity.

The State responds that the defendant has waived this issue by failing to make references to the record to support his position. Tenn. Crim. App. R. 10(b); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). Notwithstanding waiver, the State also contends that the search warrant was validly issued and executed.

Our review reveals that the record on appeal contains the search warrant and its accompanying affidavit, defendant Brooks' motion to suppress, and the Order denying the motion. We do not find a transcript of the hearing on the motion to suppress on behalf of defendant Brooks. It is the duty of the accused to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the base of the appeal. T.R.A.P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). However, we will address defendant Brooks' issues as posed in his brief.

The subject warrant was issued February 18, 2003, after investigators had examined the contents of defendant Watson's computer. The affidavit in application for this search warrant contained a detailed summary of the events surrounding the homicide being investigated. The affidavit made specific references to certain email messages between the co-defendants and sought to seize defendant Brooks' computer for confirmation of the referenced emails as well as other evidence related to the homicide. The search warrant was for the premises at 253 Suzanne Drive in Shreveport, Louisiana, a single-family brick residence. It directed seizure, among other items, of "computer(s) and other media by which electronic data may be stored or transmitted, including but not limited to hard drives, floppy drives, zip drives, CD's, Jazz Drives, or any other non-static media."

Although we view the search warrant as sufficient in terms of describing the premises and the items to be seized, defendant Brooks contends that a second warrant was required which would authorize opening the components to read the contents. Defendant Brooks points to no authority to support this proposition. We conclude that the warrant itself contemplates the examination of the electronic data which might bear evidence of defendant Brooks' relationship with defendant Watson and the homicide. See United States v. Upham, 168 F.3d 532, 536 (1st Cir. 1999).

We find no error in the trial court's denial of defendant Brooks' motion to suppress. We would further observe that only three documents derived from defendant Brooks' computer were introduced as evidence. One was an email from defendant Brooks to defendant Watson which had been previously introduced as taken from defendant Watson's computer. The other two documents were a letter from defendant Brooks to an attorney retaining representation for defendant Watson concerning the victim's estate and an email to "Jannie Brooks" acknowledging a merchandise order. Defendant Brooks would have no expectation of privacy in the co-defendant's electronic data. State v. Ross, 49 S.W.3d 833, 840 (Tenn. 2001). The remaining two documents, even if admitted in error, would constitute harmless error in light of the other evidence supporting defendant Brooks' convictions.

Accordingly, we conclude that the motions to suppress for both defendants were properly overruled.

## Mistrial

Both defendants contend that the trial court erred in failing to grant a mistrial on two occasions. The first occasion occurred during cross-examination by the prosecutor of defendant Watson. The colloquy was as follows:

Prosecutor:     You didn't print off the cremation order because you intended to kill Al?

Watson:          No.

The Court:      Do you mean - ?

Prosecutor:     Excuse me. I mean Larry [the victim], excuse me. Larry. Well , you may intend - - well, no - - strike that.

Defendant's Attorney:     I object to that.

Watson's Attorney:          Oh, your Honor.

Prosecutor:     Larry.

. . . .

Prosecutor:     Excuse me for misspeaking. Larry.

A mistrial was requested and denied. The trial court gave an appropriate curative instruction to the jury concerning the prosecutor's remarks as follows:

THE COURT: Thank you. Members of the jury, again, I want to point out to you that there was a muttered statement by the General Phillips alluding to the fact that Mr. Brooks might be the next victim of Mrs. Watson, a highly improper statement. You probably noted that from the fact that Mr. Phillips immediately apologized to the court and to the jury for saying that, but please do not let that have any influence on you of any kind in this case. It's not an assumption you can make or a prejudice that you can have against the defendant, and you must not consider it for any purpose in this case. Does everyone understand that? If you could all tell me that you'll not consider that for any purpose at all in this case whatsoever, would you raise your hands please?

(Jurors comply.)
THE COURT: Let the record show all twelve jurors – all fourteen jurors raised their
   hands. Thank you.

During rebuttal closing, the prosecutor, responding to defendant Brooks' arguments of being in Louisiana during the murder, analogized Osama Bin Laden's physical absence from the scene of the 9/11 attacks. An objection was made by defendant Brooks and overruled, but no application for mistrial was made.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). A mistrial is appropriate only when there is a "manifest necessity" requiring such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).

The trial court did not abuse its discretion in denying a mistrial. Neither of the remarks were so egregious as to create a "manifest necessity." A curative instruction was given in the first instance which all jury members signaled they would follow. No request for mistrial was made in the second instance nor would it have been appropriate. The reference to Osama Bin Laden was merely an illustration of criminal responsibility in response to defendant Brooks' argument of non-involvement. We are unpersuaded that Osama Bin Laden has achieved such a demonic status that his invocation dispels all reason and necessitates a mistrial.

Jury Instructions

The co-defendants next contend that the trial court erred in failing to instruct the jury on solicitation as a lesser-included offense of first degree murder.

The issue of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). The appropriate standard of review for mixed questions of law and fact is de novo without a presumption of correctness. Id.; see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

Solicitation is a lesser-included offense of first degree murder under part (c)(2) of the test in Burns. Id. at 466-67. However, there must be proof in the record that would support the charge. Id. at 468. The trial court must conduct a two-step inquiry for determining whether the lesser-included offense is justified by the evidence. That inquiry involves determining:
   whether any evidence exists that reasonable minds could accept as to the lesser-
   included offense. In making this determination, the trial court must view the

evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. Whether an instruction is required depends upon the evidence, not the theory of the defense or the State. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002); State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002).

Solicitation is defined as follows:
Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

T.C.A. § 39-12-102(a) (1997).

However, part (c) of the Burns test is limited to "'situations in which a defendant attempts to commit, or solicits another to commit, either the crime charged or a lesser-included offense, but no proof exists of the completion of the crime.'" State v. Robinson, 146 S.W.3d 469, 487 (Tenn. 2004) (quoting State v. Ely, 48 S.W.3d 710, 717 (Tenn. 2001)).

As in these cases, the evidence in the instant case established either the completed offense of murder or the defendants' claim of innocence. It was not error for the trial court to decline to instruct the jury on solicitation.

Sentencing

The defendants jointly contend that their sentences of twenty years for conspiracy are improper pursuant to Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). The Tennessee Supreme Court has held that the Tennessee sentencing procedures are not violative of the Sixth Amendment right to trial by jury as protected in Blakely. State v. Gomez, 163 S.W.3d 632, 659 (Tenn. 2005). Consequently, the sentence would not be improper.

We note from our review that the transcript of sentencing refers to merging the conspiracy conviction with the conviction for first degree premeditated murder. Tennessee Code Annotated section 39-12-106(c) provides that an individual may be convicted of conspiracy and the offense which was the object of the conspiracy. The Sentencing Commission Comments to that section make it clear that the two are not merged. However, the judgment reflects that the conspiracy conviction is to run concurrently with the life sentence for murder. With certain exceptions, the question of concurrent or consecutive sentences is left to the sound discretion of the trial court. State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). In this instance, we conclude that the judgment reflects the intent of the trial judge and should prevail. We affirm the sentences as contained in the judgment forms of the respective defendants.

-25-

Evidentiary Issues

Defendant Watson objects, in eight separate issues, to the admission of certain items of evidence. She makes no citation in her brief to authority in support of her argument concerning six of these items. Failure to cite authority to support argument will result in waiver of the issue. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). The six issues we deem as waived are defendant Watson's objections to the admission of:

(1) Telephone conversation transcripts between the defendants;
(2) "Extraneous matter" within email messages between the defendants;
(3) Defendant Watson's handwritten entries in the book, The Language of Letting Go;
(4) A map showing the route from Knoxville, Tennessee, to Jackson, Mississippi;
(5) Correspondence and greeting cards exchanged between the defendants; and
(6) Evidence of blood stains at the crime scene.

Defendant Watson also objects to a sign found at defendant Brooks' home that read: "Welcome Home Jannie, I Love You," and to evidence of pry marks on the basement door and the crowbar found in the victim's truck bed. Defendant Watson's basis of objection as to both is to relevance.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

We conclude that both items of evidence were relevant and were properly admitted. The sign provided additional evidence of the relationship between the defendants and was relevant to motive. The pry marks on the basement were circumstantial evidence of a staged, forced entry from the basement. The fact that tests were inconclusive as to being made by the subject crowbar did not vitiate the evidence's relevance. Defendant Watson has failed to demonstrate an abuse of discretion in the admission of these items.

Photographs of Victim

Defendant Watson objects to the admissibility of the photographs of the victim at the crime scene. Defendant Watson contends that the pictures created an "unfair prejudice" against her. All proposed photographs were reviewed by the trial court in a pre-trial hearing, and certain photographs

were excluded. Ultimately, only three photographs of the victim were admitted, one from a remote distance. The only close-up was of blood spatter on the victim's chest.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

We, therefore, must first determine whether the photographs were relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

After review, we conclude that there was no abuse of discretion. The photographs admitted demonstrated where the body was found and the spatter indicated the close range of the fatal shots. All photographs of the victim were relevant and not excessively gruesome such as to incite prejudice toward defendant Watson. The photographs were properly admitted.

Impeachment by Bad Check

Defendant Watson contends that the trial court erred in allowing her impeachment by inquiry concerning bad check charges which were dismissed after payment of the checks. For impeachment purposes, the use of specific instances of conduct that do not result in criminal convictions is governed by Tennessee Rule of Evidence 608(b). The rule contains certain procedural steps required prior to use of such impeaching evidence. A jury-out hearing must be conducted to examine whether the instances of conduct are probative of truthfulness or untruthfulness and whether a reasonable factual basis exists. Prior to admission, the trial court must find that the conduct was probative of truthfulness or untruthfulness and then balance the probative value against the danger of unfair prejudice to the defendant. The probative value must substantially outweigh the danger of unfair prejudice. Tenn. R. Evid. 608(b).

A pre-trial hearing was held in this instance. The trial court found that the act of issuing bad checks was dishonest and "that the probative value on credibility in this regard outweighs any unfair prejudicial affect on the substantive issues in the case."

On cross-examination, defendant Watson acknowledged issuing twelve bad checks to various merchants during 2001. She stated that the charges were dismissed after payment of the checks. We conclude that the dismissal of criminal charges under these circumstances does not equate to a finding of innocence on defendant Watson's behalf. Rule 608 is not dependent on criminal convictions for admissibility but, instead, concerns conduct bearing on the witness's honesty. Accordingly, we conclude there was no error in allowing the evidence as impeachment.

## Limits on Opening/Closing

Defendant Watson contends that the trial court improperly limited counsel in the time allotted for opening and closing arguments.

Rule 29(c) of Tennessee Rules of Criminal Procedure provides that the order and length of arguments is within the sound discretion of the trial judge who shall allow a full presentation of the theory of the case.

We note that the time limits set were in a pre-trial order. The order allowed fifteen minutes for opening statements to the prosecutor and fifteen minutes to each of the defendants. The prosecutor was allowed forty minutes for closing argument and each defendant was allowed thirty minutes. No objections were made to the time parameters nor were any motions for expansion later filed. Defendant Watson has not demonstrated an abuse of discretion on behalf of the trial court on this issue.

## Conclusion

After careful review, we affirm the co-defendants' convictions and sentences as contained in the judgment forms.

_____
JOHN EVERETT WILLIAMS, JUDGE