IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 7, 2017

**STATE OF TENNESSEE v. BRANDON VANCE**

**Appeal from the Criminal Court for Shelby County**
**No. 15-00211          Paula L. Skahan, Judge**

_____

**No. W2016-01015-CCA-R3-CD**

_____

Defendant, Brandon Vance, was convicted of first degree felony murder by a Shelby County jury. He received a life sentence. On appeal, Defendant argues that the evidence was insufficient to support his conviction. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee, for the appellant, Brandon Vance.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; Pam Stark and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Dionne Lee testified that the victim, Larry Wilkins, Jr., was her fiancé, and they lived at the Sycamore Lake Apartments in March 2014. They both worked for FedEx. On March 9, 2014, Ms. Lee and the victim both went to work from 10:00 a.m. until 2:00 p.m. Ms. Lee took a nap when she got home from work, and when she awoke, the victim was asleep on the couch. Ms. Lee lay back down and awoke again at 11:30 p.m. to the sound of five or six gunshots. She did not see the victim on the couch so she walked outside to see if he was outside or if he had left. Ms. Lee noted that the victim had a black Ford Mustang that he had been trying to sell, and his car was gone when she went

outside, and a couple of people were standing around. She said that the victim had "for sale" signs on the car, and he had listed it for sale on Craigslist and on Facebook.

Ms. Lee testified that she asked the individuals what happened, and "they said that the guy in the Mustang shot that guy over there." She said that they pointed to the victim who was lying on the ground. Ms. Lee noticed a gold Chevrolet Monte Carlo parked in the area that she had never before seen parked there. She said that there were some text messages on the victim's phone concerning the Mustang, and she turned the phone over to police after they arrived. The last text message indicated that someone was coming to look at the car at approximately 11:00 p.m.

Officer Michael Huff of the Memphis Police Department responded to the scene of the shooting. He noted that the victim was unresponsive and lying on the ground, and there were five to six shell casings lying "just about 5 foot west of his feet." The victim's "eyes had already sunk in," and his skin appeared to be turning gray. Officer Huff testified that members of the fire department arrived on the scene, and placed "machines" on the victim. He said that the victim did not appear to have any signs of life, and they were unable to resuscitate the victim. Officer Huff then secured the scene. He said that the victim's car was gone, and there was another car parked in the complex that seemed out of place because there were frequent thefts in the area, and the windows were rolled down on the vehicle.

Sergeant Reginald Titus of the Memphis Police Department, Felony Response, testified that he and Sergeant Frierson were assigned to investigate the victim's murder. Sergeant Titus was assigned to investigate the crime scene. He said that the victim's car was not there, and neighbors in the apartment complex indicated that there was an unfamiliar vehicle parked in the parking lot. Sergeant Titus noted that the motor of the unfamiliar vehicle, a Chevrolet Monte Carlo, was still warm, and there was a "walkie talkie or two-way radio in it." There was also a "trader magazine" in the car. Sergeants Titus and Frierson set up surveillance on the vehicle but no one came back to retrieve it.

Sergeant James Sewell of the Memphis Police Department, Homicide Division, testified that he obtained a search warrant on the morning of March 10, 2014, to search the Monte Carlo. He said that two driver's licenses, a debit card, and other paperwork bearing Defendant's name were found inside the vehicle. The car also had a temporary drive out tag "for a vehicle that was issued to [Defendant] at 3730 Fieldbrook Street in Nashville."

Officer Michael Coburn of the Memphis Police Department, Crime Scene Investigation, testified that he processed the victim's black Ford Mustang for evidence. He dusted the car for fingerprints and swabbed it for DNA. Officer Coburn found "ridge

detail" which he explained "could be part of a print that latent print examiners are qualified to say whether or not it's going to be enough for a print, a real print, to connect to someone." Officer Coburn testified that the prints were lifted from the hood, the left and right front quarter panels, the bumper, and the driver's window. The State and Defendant stipulated that fingerprint technician James Hill processed the fingerprints and determined that one obtained from the front bumper of the car belonged to Defendant.

Sergeant Eric Kelly of the Memphis Police Department, Homicide Bureau, testified that he spoke with Defendant and Defendant's brother, Walter Collins, on March 11, 2014. He noted that Defendant came to the homicide bureau office voluntarily. Sergeant Kelly placed Defendant in an interview room, advised him of his *Miranda* rights, and Defendant signed the "Advice of Rights form." Defendant told Sergeant Kelly that he had been out, and his car broke down on Highway 51 approximately six to seven miles from where his car was located by police at the victim's apartment complex. Defendant said that he walked from Highway 51 to his girlfriend's residence at the Stratford Apartments near the University of Memphis, which was a distance of twelve to fifteen miles.

Sergeant Kelly was unable to verify Defendant's initial explanation. When Defendant was confronted with the inconsistencies and facts known to police, he admitted involvement in the victim's murder and that he was responsible for the victim's death. He also provided a statement identifying his brother, Walter Collins, and cousin, Martiness Henderson, as active participants in the murder. Defendant told Sergeant Kelly that he called the victim about a Ford Mustang that the victim had for sale using an application on Defendant's stepfather's cell phone that used a fake phone number. Defendant later used the same application on his brother's cell phone to call the victim. Defendant talked to the victim and agreed to purchase the victim's Mustang for $4,500.00. He also told the victim that he would be at the victim's apartment to look at the car. Mr. Collins had previously shown the car to Defendant on Craigslist, and there was a plan to take the vehicle without paying for it. Defendant admitted that the walkie talkies were used during the planning discussion between himself, Mr. Collins, and Mr. Henderson. They were also used to "notify when it was time to take the car."

Defendant told Sergeant Kelly that his role was to personally distract the victim while Mr. Collins and Mr. Henderson jumped into the car and took it. Defendant said that he drove his 1999 Chevrolet Monte Carlo to the victim's apartment complex. He dropped Mr. Henderson off in the middle of the apartment complex, knowing that Mr. Henderson had a gun, before going to the victim's apartment. Mr. Henderson also had one of the walkie talkies. Mr. Collins had the other one. Defendant and Mr. Collins then went to look at the car and talk to the victim. Defendant said, "We walked around the back of the car where the spare tire was. Me and [the victim] looked up and then [the

- 3 -

victim] started approaching [Mr. Henderson]. I guess he got scared and [Mr. Henderson] shot him and I ran." Defendant said that Mr. Henderson shot the victim three or four times with a .380 chrome gun provided by Mr. Collins. Defendant and Mr. Henderson ran to Defendant's car but it would not start, so they both ran away on foot. Mr. Collins drove away in the victim's Mustang, and Defendant was told that Mr. Collins later picked up Mr. Henderson.

Corrie O'Bryant testified that she was living at the Sycamore Lakes Apartment Complex in March 2014. A few minutes before midnight on March 9, 2014, Ms. O'Bryant pulled into the apartment complex and noticed three or four men looking underneath the hood of a dark colored Mustang. Ms. Bryant parked her car, got out, and heard several gunshots. She went inside the apartment with her child and a friend and later walked back outside to smoke a cigarette and heard a lady screaming. Ms. O'Bryant walked over to the area where the men had been standing and saw that police had arrived. The Mustang was gone.

Fredrick Moss testified that he was with Ms. O'Bryant at the Sycamore Lake Apartments on March 9-10, 2014. He also observed some men "standing out by a car looking under the hood" as he and Ms. O'Bryant pulled into the apartment complex. He said, "It was one guy he was like in front of the hood like right there at the hood holding his hand at the hood. It was two guys on the passenger side toward the front of the car. And it was another guy on the right where the driver door at, and he was right there." The car was a black Mustang with white racing stripes on it. Mr. Moss testified that he heard gunshots as he was taking Ms. O'Bryant's baby out of the car and he "kind of crouched down." He looked around and did not hear anything else and walked into the apartment. Mr. Moss later walked out on the balcony to smoke a cigarette, and he heard a lady repeatedly yelling "oh, no." He also saw people walking in that direction. Mr. Moss told Ms. O'Bryant what happened, and she walked over to the area. Ms. O'Bryant came back later and told him that the owner of the Mustang had been shot.

Jeremy Tolbert testified that he was also living in the Sycamore Lake Apartments in March 2014. Sometime during the late night hours of March 9 into the early morning hours of March 10, 2014, Mr. Tolbert and his wife were "vaguely awoken by the sound of what we thought was gunshots." Mr. Tolbert got up and looked out the bedroom window but did not see anything. He walked into the living room with his wife, looked out the window, and saw the victim's body lying on the ground. Mr. Tolbert told his wife to call the police, and he walked outside to check on the victim who appeared to be deceased.

Samantha Tolbert, Jeremy Tolbert's wife, testified that she was getting ready for bed near midnight on March 9, 2014, when she heard six gunshots. Mrs. Tolbert looked

out the window and saw the victim lying on the ground. She also saw the Mustang that the victim drove "speeding out of the parking lot." Mrs. Tolbert noted that she heard the Mustang's motor start up before she heard the gunshots. She said that she "grabbed sugar and blankets" to help stop the bleeding and ran downstairs with Mr. Tolbert to help the victim. By the time Ms. Tolbert arrived, the victim was dead.

Lekevva Allen testified that she lived at the Sycamore Lake Apartments in March 2014. At some point during the late night hours of March 9, 2014, and the early morning hours of March 10, 2014, Ms. Allen was sitting at her table doing homework when she heard gunshots. She ran to look outside and saw the victim "fall." She also saw "two or three guys like run towards the back or the side of the apartments. And [she] saw like a dark colored car with a white stripe go out of the parking lot which would be West Chester Circle." Ms. Allen had seen the car in the parking lot on previous occasions, and she assumed the owner lived there.

Dr. Marco Ross performed an autopsy on the victim. He testified that the victim was shot from behind six times, and he recovered bullets from the victim's spine, armpit, thigh, scrotum, chest, and left arm. Dr. Ross testified that the victim died as a result of multiple gunshot wounds.

*Analysis*

Defendant argues that "no evidence exists to support a finding that [Defendant] intended to commit a robbery." Therefore, he contends that the evidence was insufficient to "support a finding that [Defendant] is guilty of first degree murder in the perpetration of a felony, specifically a robbery." We find that the evidence presented at trial supports Defendant's conviction for first degree felony murder.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn

therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Felony first degree murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery. . . ." Tenn. Code Ann. § 39-13-202(a)(2). In order to support Defendant's conviction for felony murder, the State must prove that a felony was committed, namely a robbery, that Mr. Wilkins was killed during the commission of the felony, and that Defendant either committed the felony murder himself or he was criminally responsible for Mr. Henderson's actions. *See State v. Cureton,* 38 S.W.3d 64, 73 (Tenn. Crim. App. 2000) (Evidence sufficient to support Defendant's conviction under either theory.) Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). The intent to commit the underlying felony may be formed "concurrent with the commission of the act causing the death of the victim." *State v. Buggs,* 995 S.W.2d 102, 107 (Tenn. 1999). Such intent may be inferred from the defendant's actions. *Id.* at 108.

A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both. T.C.A. § 39-11-401(a). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2).

Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." *Id*. (citing *Ball*, 973 S.W.2d at 293). To prove a defendant's guilt under the theory of criminal responsibility, the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[ ] in the commission of the crime.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). Criminal responsibility for the actions of another person "requires that a defendant act with a culpable mental state, specifically, the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997) (quoting T.C.A. § 39-11-402(2)). "A person acts with intent as to the nature or result of conduct when it is that person's conscious objective or desire to engage in the conduct or cause the result." *Id*. (citing T.C.A. § 39-11-302(a); *Maxey,* 898 S.W.2d at 757).

In this case, Defendant gave a statement to police admitting that he, Mr. Henderson, and Mr. Collins planned to commit theft of the car from the person (the victim) and that Mr. Collins had provided Mr. Henderson with a .380 caliber chrome handgun to use during the theft from the victim. He also admitted that he was responsible for the victim's death. Defendant admitted that he used an application that generated a false telephone number to remain anonymous in order to call the victim about the vehicle that had been advertised for sale on Craigslist. Defendant spoke with the victim and told him that he would be there to look at the car, and he agreed to purchase the Mustang for $4,500.00. However, Defendant and his accomplices planned to take the vehicle from the victim without paying for it. Defendant told police that his role in the robbery was to personally distract the victim while Mr. Collins and Mr. Henderson jumped into the victim's car and took it.

Defendant also told police that he drove his car to the apartment complex where the victim lived. He dropped Mr. Henderson off in the middle of the complex with the walkie talkie, knowing that Mr. Henderson had a gun, before going to the victim's apartment. Mr. Collins had the other walkie talkie, and they had planned to use the walkie talkies to "notify when it was time to take the car." Defendant and Mr. Collins then went to talk to the victim and look at the car. Defendant indicated that he thought Mr. Henderson got scared when the victim approached him, and Mr. Henderson shot the victim multiple times before driving away in the victim's Mustang. Therefore, the theft

of the car was by violence to the victim. Defendant and Mr. Collins ran to Defendant's car but it would not start, so they both ran away on foot.

The details of Defendant's statement were corroborated by multiple witnesses. Two witnesses testified that three to four men were looking under the hood of the victim's Mustang at the time of the shooting, and they heard the gunshots. Two other witnesses testified that they heard gunshots and looked out the window and saw two men running away and another speeding away in the victim's Mustang. Samantha Tolbert testified that she heard six gunshots, and the medical examiner confirmed that the victim was shot six times.

It is clear by the verdict that the jury found that the State had proven beyond a reasonable doubt that Defendant, along with Mr. Collins and Mr. Henderson, murdered the victim during the course of robbing him of his car. The evidence clearly supports this conclusion. Additionally, the jury was instructed regarding criminal responsibility and rejected Defendant's argument that he had not intended to commit a robbery. Defendant is not entitled to relief on this issue.

Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE