IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2018

## STATE OF TENNESSEE v. MARICO VALES

**Appeal from the Criminal Court for Shelby County**
**No. 16-01967      J. Robert Carter, Jr., Judge**

### No. W2018-00424-CCA-R3-CD

The Defendant, Marico Vales, was convicted by a Shelby County Criminal Court jury of first degree felony murder and especially aggravated robbery. *See* T.C.A. §§ 39-13-202 (2018) (first degree murder); 39-13-403 (2018) (especially aggravated robbery). The trial court sentenced the Defendant to concurrent terms of life imprisonment and twenty-five years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Harry E. Sayle III (on appeal), Memphis, Tennessee; Stephen C. Bush, District Public Defender; and Austin Scofield and Carla Taylor (at trial), Assistant District Public Defenders, for the appellant, Marico Vales.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Robert Felkner and Phillip Harvey, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the June 11, 2015 homicide of Khaled Khaya, who was fatally shot when working at Zorro Market (the market) in Shelby County. At the trial, Hasan Wadi testified that he owned the market at the time of the incident, that he opened the market at 8:00 a.m. on June 11, that he left at 8:30 p.m., and that the victim worked the remainder of the evening shift. Mr. Wadi said that he and the victim were friends and that the day of the shooting was the victim's second day of work.

Mr. Wadi said that he called the market around 10:45 p.m., that the victim did not answer, that he returned to the market, and that he saw police cars when he arrived.

Mr. Wadi testified that he provided the police with a surveillance recording that showed various angles from inside the market around the time of the shooting, and a portion of the recording was played for the jury.[1] In the recording, at approximately 9:53 p.m., a male employee, whom Mr. Wadi identified as the victim, stood behind the cash register at the front counter assisting an African-American male customer, who wore a dark-colored shirt and had arm tattoos. The customer was later identified as the Defendant. The Defendant purchased items and paid with cash. After the victim provided the Defendant with change, the victim retrieved and provided the Defendant with a small pad of paper on which the Defendant wrote and returned to the victim. The two men conversed, the victim made entries on the cash register, and the Defendant provided a card, which the victim swiped on a machine beside the cash register. The men conversed again, and the victim swiped the card again. The two men conversed a third time, and the victim returned the card and provided the Defendant with a small piece of paper. At approximately 9:56 p.m., the Defendant left the counter. The victim and the Defendant were separated by glass that contained a small opening.

Mr. Wadi identified photographs of the market, described the general layout, and noted "bullet proof glass" separated employees and customers at the front counter. He identified photographs of the cash register and of the machine used for debit, credit, and EBT food stamp transactions. A portion of the surveillance recording that showed only the victim behind the counter was played for the jury. In the recording, the victim, at approximately 9:59 p.m., left the front counter and entered a door, which Mr. Wadi said led to the "pizza section" at which employees prepared pizzas after a customer ordered and paid. A glass window beside the door allowed for slight visibility into the pizza preparation area. At 10:02 p.m., the victim returned to the front counter and removed what Mr. Wadi described as latex gloves. Mr. Wadi said that the gloves were worn when preparing pizzas. He said that the pizza order depicted in the recording was paid for with an EBT card. Mr. Wadi stated that EBT cards were used regularly at the market, that each card was associated with an identification number, and that he provided the police with the number associated with the last EBT transaction for a pizza purchase.

Mr. Wadi testified that when preparing the pizza, the victim would have placed toppings on a frozen pizza crust and inserted the pizza into an oven that moved the pizza on a conveyer belt. He said that after about five minutes, the pizza came out of the oven baked fully and that it was impossible to burn a pizza using this procedure and oven.

---

[1] The record reflects that the time stamp on the surveillance recording was approximately twenty minutes fast. This opinion reflects the adjusted time for accuracy. We note that the recording did not have sound.

A portion of the surveillance recording that showed the victim and customers at the front counter was played for the jury. In the recording, at approximately 10:24 p.m., the victim assisted two African-American men. The Defendant and a man wearing a light-colored shirt stood at the front counter. The victim left the front counter away from the camera's view but returned with what appeared to be scratch-off lottery tickets and handed them to the Defendant. At approximately 10:26 p.m., the man wearing the light-colored shirt appeared to be talking on a cell phone. The men bought several additional items and paid with a plastic card, which the victim swiped on the machine beside the cash register. The victim placed the items into a bag and provided the man wearing the light-colored shirt with a receipt at 10:27 p.m. The men left the front counter.

In the recording, the victim assisted various customers and periodically walked away from the camera's view in the direction of the pizza preparation area and lottery ticket dispenser. At approximately 10:31 p.m., the Defendant returned to the front counter and provided the victim with scratch-off lottery tickets. The victim and the Defendant walked out of the camera's view and toward the pizza preparation area and the lottery ticket dispenser. The Defendant and the victim returned to the front counter, and the victim provided the Defendant with scratch-off lottery tickets. At approximately 10:32 p.m., the Defendant left the counter. The victim assisted other customers, and at approximately 10:34 p.m., the Defendant returned to the front counter with scratch-off lottery tickets. The Defendant provided the victim with the tickets, and both the Defendant and the victim walked away from the camera's view toward the pizza preparation area and the lottery ticket dispenser. The Defendant and the victim returned to the front counter, the victim provided the Defendant with scratch-off lottery tickets, and the Defendant scratched the tickets at the counter. The Defendant provided the tickets to the victim, who walked away from the camera's view, and the victim provided the Defendant with additional tickets when the victim returned. The Defendant scratched the tickets at the counter. At approximately 10:38 p.m., the Defendant walked out of the camera's view toward the pizza preparation area, and a shadow moved in the opposite direction across the camera's view a couple of seconds later.

At approximately 10:40 p.m., an African-American man wearing an orange hat, who was later identified as Antonio Jones, appeared momentarily at the front counter and walked away from the camera's view. Mr. Jones returned to the counter, jumped on the counter, leaned through the opening in the bullet-resistant glass, and reached toward the cash register. Mr. Jones jumped off the counter into the employee area, fidgeted with the cash register, which did not open, and moved out of the camera's view. At 10:41 p.m., an African-American man, who was later identified as Christian Hall and wore a dark shirt and a light-colored cloth around his neck, approached the front counter. Mr. Jones returned to the cash register, fidgeted with the cash register, jumped across the counter toward the exit, and both men moved out of the camera's view.

A portion of the surveillance recording that showed the victim behind the front counter was played for the jury. In the recording, at approximately 10:23 p.m., the man wearing the light-colored shirt briefly walked to the pizza preparation area, while the victim remained at the front counter. The victim returned to the pizza preparation area, and the Defendant walked to the pizza preparation area. The Defendant walked toward the front counter, and at 10:24 p.m., the victim returned to the front counter. Multiple times the victim retrieved scratch-off lottery tickets and returned to the front counter. At 10:38 p.m., the victim returned to the pizza preparation area, and the Defendant stood in the pizza preparation area across from the victim. The Defendant walked away from the pizza preparation area and out of the camera's view seconds later. At 10:40 p.m., Mr. Hall approached the pizza preparation area, extended his arm toward the victim, and entered the preparation area. Mr. Jones jumped on the front counter and entered the employee area, took money from the cash register located near the lottery ticket dispenser, and jumped across the counter and away from the camera's view.

Mr. Wadi identified a photograph of the pizza station, which was received as an exhibit. The photograph depicted the pizza oven and showed that no bullet-resistant glass separated an employee from a customer. Mr. Wadi said that the market usually stopped serving pizza around 9:00 or 9:30 p.m. but that an employee would prepare a pizza for a customer known to the employee after this time. He said that the store closed at 11:00 p.m.

A portion of the surveillance recording that showed the employee area from an area closer to the lottery ticket dispenser was played for the jury. In the recording, the victim walked away from the camera's view toward the pizza preparation area. At approximately 10:38 p.m., the Defendant walked from the front counter toward the pizza preparation area and away from the camera's view. Seconds later, the Defendant walked away from the pizza preparation area, past the front counter, and out of the camera's view. At 10:40 p.m., Mr. Hall and Mr. Jones walked toward the pizza preparation area and away from the camera's view. Mr. Jones ran toward the front counter, jumped on the counter, and attempted to open the cash register located to the right of the opening in the bullet-resistant glass. Mr. Jones walked to the second cash register, removed the money, walked to and fidgeted with the first cash register, and jumped across the counter toward the exit.

Mr. Wadi testified that approximately $8,000 was taken from the store.

On cross-examination, Mr. Wadi testified that it took approximately five to six minutes to bake a pizza and that the conveyor belt speed and the temperature could not be adjusted. After examining the summary transaction printout, he clarified that the receipt was a summary of the day's credit card transactions, that the receipt did not reflect any EBT transactions, and that a different machine was used for EBT transactions. He clarified that he did not call the market on the night of the incident but that he called the

victim's cell phone between 10:45 and 11:00 p.m. Mr. Wadi said that he did not usually call the market after he left but that he wanted to check on the victim, who was a new employee. Mr. Wadi said that he intended to return to the store to assist the victim at closing and that he called the victim on his way to the market.

Mr. Wadi testified that the surveillance recording did not reflect a busy evening at the market. He said that the victim's wearing latex gloves in the recording indicated the victim was preparing a pizza. Mr. Wadi said that he did not perform an audit to determine the amount of money taken and that $8,000 was an estimate. He said that three cash registers were inside the market, that one was used for lottery purchases, that another was used for check cashing and money orders, and that the third was used for all credit card, EBT, and non-lottery cash purchases. Mr. Wadi said that the money was taken from the register used for cashing checks and contained the most money.

Mr. Wadi testified that the victim had previous experience working at a convenience store and making pizzas, that the victim knew not to send a pizza through the oven more than once, and that sending a pizza through the oven twice would burn it. He said surveillance cameras were outside the market but that the cameras belonged to the owner of the shopping center in which the market was located.

Tom Pae testified that he managed the shopping center. He said that he provided sheriff's deputies with recordings of the parking lots. Mr. Pae identified the recording of the front parking lot, a portion of which was played for the jury.

In the recording, at approximately 9:46 p.m., a dark-colored car drove into the parking lot and parked partially within view of the camera. The car parked in such a manner that only the passenger-side door and rear of the car were visible. The driver's side was not visible. At approximately 9:52 p.m., the Defendant walked from the building toward the dark-colored car, around the rear of the car, and out of the camera's view. Seconds later, the dark-colored car moved slightly, as though someone sat inside the car, before leaving the parking lot.

Mr. Pae identified the recording of the rear parking lot, a portion of which was played for the jury. However, the record does not reflect which portion of the recording was played. Mr. Pae testified that the recording showed two people behind a dumpster walking toward the market. Mr. Pae stated that the recording dates and times were correct.

Corsenna Newbern testified that the Defendant, whom she referred to as Rico, was the father of her two children and that on June 11, 2015, he drove her home from work. She said that the Defendant did not stay at home, that he drove to the market to a buy pizza, and that he bought pizza at the market frequently. She recalled that she and the Defendant bought pizza at the market two or three times per week. She said that she and

the Defendant paid for the pizzas with her EBT food stamp card and that, at about 9:00 p.m., she gave the Defendant her EBT card to purchase the pizza. She said that he returned home around midnight or 1:00 a.m. without a pizza but that he had cheeseburgers and fries from Wendy's for the children.

Ms. Newbern testified that Mr. Jones, whom she referred to as Montana, and the Defendant were friends. She said that Mr. Jones lived in the same neighborhood as she and the Defendant and that the Defendant and Mr. Jones borrowed each other's cars and "hung out" daily. She said that Brandon Thompson, who was Mr. Jones's brother, and the Defendant were friends. She recalled that the Defendant drove her green Honda on the night of the incident. She said that she learned later that the Defendant had been at the market where someone had been shot. She said that although the Defendant told her the pizza had been burned, the market had never burned a pizza previously.

Ms. Newbern was shown a portion of the surveillance camera from inside the market. The customer who wore the dark-colored shirt and had arm tattoos was depicted in the recording. Ms. Newbern identified the man as the Defendant based upon the tattoos.

Ms. Newbern identified a photograph of the Defendant and Mr. Jones and testified that she did not know when the photograph was taken. She identified a photograph of Mr. Jones, Mr. Thompson, Mr. Jones's young son, and a man unknown to Ms. Newbern. She identified a third photograph of Mr. Jones, Mr. Thompson, Mr. Jones's young son, and the unknown man and stated that although the photograph was taken at Chuck E. Cheese's, she had never attended a party there with the people in the photograph. Ms. Newbern said that Mr. Jones and Mr. Thompson attended her son's birthday party a couple of days after the June 11 incident. She identified a photograph of Ms. Newbern and the Defendant's green Honda and of the Defendant's silver car and said the photograph was taken at the Defendant's mother's home. She stated that the Defendant drove the green Honda on the night of the incident and changed his cell phone number after the incident.

On cross-examination, Ms. Newbern testified that the Honda was titled in her name and that she paid for it. She said that, at the time of the incident, she lived with the Defendant's mother and that the Defendant "stay[ed] . . . on and off" at his mother's home. Ms. Newbern did not know when the photograph of the Defendant and Mr. Jones at the Defendant's mother's home was taken. She said that the Defendant did not return home with extra money on the night of the incident. She denied that she saw the Defendant with any money in the days and weeks after the incident and said that the Defendant made no expensive purchases.

United States Department of Agriculture Agent Lynn Bracey testified that around June 18, 2015, Shelby County Sheriff's Detective Steve Bierbrodt contacted him

regarding the identity of the owner of an EBT debit card. Agent Bracey stated that the card used for a June 11, 2015 transaction in the amount of $12.66 belonged to Ms. Newbern.

On cross-examination, Agent Bracey testified that EBT transactions were time stamped and that the "Alert System" contained EBT transaction data, including information related to each store that accepted EBT cards as a form of payment, each card number, and the amount of each purchase. He said that the contract between the State of Tennessee and the third party processor required the time stamp data to be accurate. Agent Bracey reviewed the total transaction summary receipt from the market previously identified by Mr. Wadi and testified that the receipt did not reflect any specific EBT transaction.

Julius Miller testified that he went to the market on June 11, 2015, although he could not recall the time. He said that he did not see anyone inside the market when he approached the front counter to pay for a beverage and that he returned the beverage, left the store, and called the police because "something didn't feel right." He said that a "young guy" arrived at the market, that they entered the store, and that they saw the victim was deceased. Mr. Miller said that he saw blood and ran out of the store and that he called the police and waited for them to arrive.

Mr. Miller did not recall seeing a green Honda in the parking lot and testified that nobody drove through the parking lot when he and the man waited for the police to arrive. He said that he did not see the Defendant at the market and that he did not smell a burned pizza while inside the market.

Shelby County Sheriff's Deputy Richard McKinney testified that dispatch received a call regarding this incident, that he responded to the scene, and that he saw the victim lying on the floor between a food preparation table and a freezer. He secured the scene and contacted a detective.

Shelby County Sheriff's Detective Steve Bierbrodt testified that he responded to the scene and that he reviewed the surveillance recordings. He identified photographs depicting three cartridge casings, a bullet hole on a wall sign, a trajectory rod going through the bullet hole on the sign and wall, the victim lying on the floor between the "pizza area" and the freezer, an open cash register containing only coins, and footprints inside and outside the market. Detective Bierbrodt identified a photograph of a pizza order form reflecting the name Rico. Detective Bierbrodt stated that the sign and drywall were removed in order to obtain the bullet projectile.

Detective Bierbrodt testified that he reviewed the surveillance recording from inside the market, that he observed a person returning to the front counter multiple times, and that the person ordered a pizza and paid for the order with what the detective

believed was a debit card. He said that he showed the recording to Mr. Wadi, that Mr. Wadi identified the EBT machine as the machine used to pay for the pizza, and that the detective obtained the card information from the Department of Agriculture.

Detective Bierbrodt testified that on June 18, 2015, he spoke with Ms. Newbern, who stated that she sent the Defendant to the market to purchase a pizza on the night of the incident. Detective Bierbrodt stated that he interviewed the Defendant, who initially said that he and Mr. Thompson went to the market to order a pizza but that he did not "get the pizza" because it had been burned. Detective Bierbrodt said that, upon further questioning, the Defendant stated that as he left the parking lot, he saw Mr. Hall and Mr. Jones. The recording of the interview was played for the jury.

In the recording, the detectives stated that the Defendant requested to speak with them and asked the Defendant what occurred. The Defendant thought that Mr. Jones and Mr. Jones's stepbrother, whom the Defendant later identified as Mr. Hall, "did this." The Defendant denied seeing Mr. Hall since the Defendant saw him "run out of the store that night" but admitted seeing Mr. Jones. The Defendant denied that Mr. Jones spoke about the robbery or shooting. The Defendant admitted talking on the telephone since the Defendant's arrest about "what was going on." The detective said the surveillance recording showed that the Defendant "paused" when he "backed out" of the parking lot and asked the Defendant who he saw. The Defendant said that he saw Mr. Jones and Mr. Hall, who he referred to as "Champ." The Defendant denied knowing about the robbery and shooting and said he was at the market to purchase a pizza. He denied being a "lookout." The Defendant said that Mr. Jones lived within walking distance of the market.

In the recording, the detective drew a map of the market and the surrounding area. The detective indicated that the Defendant's car was parked along the right side of the building when leaving the market and stated that two men ran out of the building, around the right of the building, and behind the building. The Defendant identified on the map the nearby apartment complex at which Mr. Jones lived. The Defendant said that "they" did not need a car but that Mr. Hall drove a dark blue Lexus. The Defendant said that he saw Mr. Jones and Mr. Hall when they entered and left the market. The Defendant denied staying in the parking lot to find out what they were doing and said he was going to look for marijuana because the victim told him the pizza would be ready in approximately fifteen minutes.

In the recording, the Defendant stated that Mr. Jones wore an orange hat at the time of the incident and that Mr. Jones did not talk to him about the robbery. The Defendant said that he saw Mr. Jones once after the robbery, that Mr. Jones said he had $1,000 for an apartment, and that the Defendant never saw any money. The Defendant said that before his arrest, he had a Cricket Cellular phone and a Trac phone. The Defendant identified a photograph of Mr. Hall and stated that any guns would have been

-8-

at Mr. Hall's home. When asked if he saw Mr. Jones and Mr. Hall carrying anything when they ran out of the market, the Defendant said he saw "a little bag" but could not determine what was inside.

In the recording, the Defendant implicated Mr. Jones in two additional robbery-related homicides. Although the Defendant thought Mr. Jones was the shooter in the present case, the detective said the surveillance recording showed that Mr. Hall shot the victim. The detective prepared a photograph lineup and presented it to the Defendant. The Defendant identified one person whom the Defendant saw enter and leave the market at the time of the incident. As the detective prepared a second photograph lineup, another detective asked the Defendant what happened on the night of the shooting. The detective told the Defendant that the deputies would help the Defendant as long as the Defendant was honest. The detective stated Mr. Jones told the deputies that Mr. Jones and the Defendant "were together that night," and the Defendant denied the allegation and said he did not have a phone to communicate with Mr. Jones. When asked how Mr. Jones and Mr. Hall came to be at the market at the same time as the Defendant, the Defendant said that "they had to have been waiting." The Defendant stated that he and Mr. Thompson were in the Defendant's car on the night of the incident.

Detective Bierbrodt testified that he obtained a search warrant for the Defendant's cell phone and that the photograph lineups referenced in the recording included photographs of Mr. Hall and Mr. Jones. Detective Bierbrodt said that the Defendant identified Mr. Jones in one lineup and Mr. Hall in another. Detective Bierbrodt stated that he interviewed Mr. Hall, Mr. Thompson, and Mr. Jones, whom the detective said were all brothers and the Defendant's friends. Detective Bierbrodt stated that Mr. Thompson and Mr. Jones each consented to a search of their respective cell phones. Detective Bierbrodt stated that Mr. Hall broke his cell phone when he was taken into police custody, preventing a search of the phone.

Detective Bierbrodt identified Mr. Thompson in the surveillance recording depicting the front parking lot of the market and stated that Mr. Thompson appeared to be talking on a cell phone and getting out of a vehicle. Detective Bierbrodt reviewed the photograph previously identified by Ms. Newbern as depicting Mr. Jones, Mr. Jones' young son, Mr. Thompson, and a man unknown to Ms. Newbern. Detective Bierbrodt stated that the photograph depicted Mr. Jones, Mr. Thompson, and Mr. Hall and that it had been taken between March and May 2015. Detective Bierbrodt reviewed the photograph taken at Chuck E. Cheese's and stated that it showed Mr. Thompson, Mr. Jones, and Mr. Hall. Detective Bierbrodt reviewed the photographs showing Ms. Newbern's green Honda and the Defendant and Mr. Jones standing on a driveway. Detective Bierbrodt stated that all of the photographs were obtained from Mr. Jones's cell phone. Detective Bierbrodt identified a photograph of what he described as a "large sum[] of money in small denominations" and stated that the photograph was obtained from Mr. Jones's phone and was taken after the robbery.

-9-

On cross-examination, Detective Bierbrodt testified that the time reflected on the surveillance recording from inside the market was a few minutes fast and that he noted the discrepancy in his supplemental police report. He stated that he did not know the exact time the EBT card was used.

Detective Bierbrodt testified that the Defendant was cooperative and calm, that he did not implicate himself in the robbery, and that he did not state he knew where the firearm and money could have been located. Detective Bierbrodt said that nobody he interviewed stated the Defendant had a role in the robbery and shooting. Detective Bierbrodt agreed that the surveillance recording of the front parking lot showed Mr. Thompson getting out of the passenger side of the green Honda and that Mr. Thompson told the detective what the Defendant said about the pizza and why the men were at the market. Detective Bierbrodt agreed that Mr. Thompson reported seeing Mr. Hall and Mr. Jones running inside the market and that Mr. Thompson, Mr. Hall, and Mr. Jones were brothers. Detective Bierbrodt did not recall whether Mr. Thompson was inside the market. Detective Bierbrodt said that neither the proceeds nor the firearm from the robbery were found inside Ms. Newbern's green Honda but that fingerprints were found inside the car, although he was unsure to whom the fingerprints belonged.

Detective Bierbrodt testified that he saw a pizza being prepared and that it could have been the pizza the Defendant ordered. Detective Bierbrodt said that he did not find a burned pizza at the scene, although the Defendant said the victim had reported to the Defendant that the pizza had been burned. Detective Bierbrodt said the surveillance recording showed that the victim only made one pizza from the time the Defendant placed the order until the shooting. Detective Bierbrodt said that he did not interview the bystanders who called the police but that they were interviewed by a detective. Detective Bierbrodt said that he did not ask anyone what role the Defendant played in the incident.

Shelby County Sheriff's Detective Richard Whitaker testified that he analyzed the Defendant's cell phone. The telephone call log showed that the phone was not used to place calls and did not receive calls between June 9, 2015, and July 14, 2015, and that the most frequent telephone number called from the Defendant's phone was the number Detective Bierbrodt identified as belonging to Mr. Jones and that the second most frequent contact was labeled "Baby Momma."

On cross-examination, Detective Whitaker testified that the Defendant's cell phone did not reflect any calls on June 11, 2015, and that the Defendant's phone was used to call Mr. Jones's cell phone nine times between June 7 and June 9. On redirect examination, Detective Whitaker stated that he did not attempt to retrieve deleted calls and text messages from the Defendant's phone. Detective Whitaker said that the gap in calls could have been the result of the Defendant's placing no calls or the result of the Defendant's erasing the calls. Detective Whitaker stated that his analysis occurred six months before the trial and that he did not have the technology to determine if calls had

been deleted. After reviewing his report, he said that the phone was a "minute phone," or what was known as "a government phone," and that he did not know whether the phone would record calls and text messages if the phone were out of minutes.

Jason Lind, a radio frequency engineer at AT&T, testified that he analyzed June 11, 2015 cell phone tower data of the tower located "just west" of the market. His report showed each cell phone line that utilized the tower, including the date and time that a call was placed. Relative to the telephone number Detective Bierbrodt identified as belonging to Mr. Jones, Mr. Lind identified a six-second outgoing call at 10:21 p.m. to the telephone number Detective Bierbrodt identified as belonging to Mr. Thompson. He identified two additional calls from Mr. Jones's phone to Mr. Thompson's phone from 10:23 to 10:24 p.m. and from 10:28 p.m. to 10:37 p.m.

Dr. Marco Ross, a forensic pathology expert, testified that he performed the victim's autopsy and that the victim sustained gunshot wounds behind the right ear and to the right mid-back. Dr. Ross determined that each wound was fatal, that the bullet entering behind the right ear perforated the skull and brain, and that the bullet entering the back traveled through the right lung, diaphragm, liver, heart, and left lung. He determined that the manner of death was homicide.

Upon this evidence, the jury convicted the Defendant of first degree felony murder during the perpetration of a robbery and especially aggravated robbery. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions because although he knew the perpetrators, he was not involved in the offenses. The State responds that the evidence sufficiently established that the Defendant aided the perpetrators by luring the victim from the area protected by bullet-resistant glass before the perpetrators arrived.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

As relevant to the present case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2018). Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear" which is "[a]ccomplished with a deadly weapon" and in which "the victim suffers serious bodily injury." *Id.* §§ 39-13-401(a) (2018), -403(a)(1)-(2) (2018).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a) (2018). "Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). A defendant's "presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. 2006). Furthermore, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime[.]" *Id.*

-12-

The parties do not dispute that Mr. Jones and Mr. Hall committed first degree felony murder during the commission of a robbery and especially aggravated robbery. The record reflects that after entering the market, Mr. Jones jumped on the front counter, went through the opening in the bullet-resistant glass, entered the employee area, and removed money from one of the three cash registers and that Mr. Hall shot the victim when the victim was in the pizza preparation area where bullet-resistant glass did not separate the victim and Mr. Hall. The Defendant stated during his police interview that Mr. Jones wore an orange baseball cap and a dark shirt at the time of the incident, which was consistent with the surveillance recording from inside the market. Likewise, the Defendant identified Mr. Hall as the person who was with Mr. Jones at the market at the time of the incident, and the Defendant identified both men in photograph lineups.

The Defendant's contention focuses on the evidence supporting his involvement in the offenses pursuant to a theory of criminal responsibility. The record reflects that the Defendant, identified by Ms. Newbern in the surveillance recordings, ordered a pizza at approximately 9:56 p.m. and paid with Ms. Newbern's EBT card. A pizza order form found at the market reflected the name Rico, which was the nickname by which Ms. Newbern referred to the Defendant. The Defendant, who drove Ms. Newbern's green Honda, left the store and returned at approximately 10:24 p.m. with Mr. Thompson, who entered the market and returned to the green Honda at approximately 10:30 p.m. However, the car did not leave the parking lot. Although the recording did not show the Defendant leaving the car, the inside surveillance recording showed that the Defendant returned to the front counter at approximately 10:34 p.m., at which time the Defendant and the victim interacted relative to scratch-off lottery tickets. The Defendant walked from the front counter in the direction of the pizza preparation area at 10:38 p.m., and seconds later he walked away from the camera's view and was not seen in the recording again. At approximately 10:40 p.m., Mr. Jones took money from a cash register, and Mr. Hall shot the victim. The green Honda left the parking lot after the shooting.

The Defendant admitted that he drove Ms. Newbern's green Honda on the night of the shooting and that Mr. Thompson was with him that night. Detective Bierbrodt identified a portion of the front parking lot surveillance recording that showed Mr. Thompson, who was wearing a light-colored shirt and was talking on a cell phone when he got out of the green Honda. Cell phone records showed that the Defendant's most frequent contact was Mr. Jones. Although the Defendant's cell phone did not receive or place calls to Mr. Jones's phone on the night of the shooting, cell phone tower data near the market showed that at 10:21 p.m., Mr. Jones's phone was used to place a six-second call to Mr. Thompson's phone. Mr. Jones's phone was used to place two additional calls to Mr. Thompson's phone at 10:23 p.m. and at 10:28 p.m., lasting approximately one minute and nine minutes, respectively. The final call ended approximately three minutes before Mr. Jones and Mr. Hall were seen inside the market, and the surveillance recordings showed that the Defendant and Mr. Thompson were at the market at the time of these calls.

Although the Defendant told the detectives and Ms. Newbern that the pizza was burned, the pizza found at the scene in the preparation area was not burned. Detective Bierbrodt stated that the surveillance recording showed that the victim only prepared one pizza from when the Defendant placed his order to the time of the shooting, and the order form found at the scene reflected the name Rico. Likewise, Mr. Wadi testified that a pizza was placed on the conveyor belt of the oven only once, that it was impossible to burn a pizza by using this procedure, and that the victim had previous experience preparing this type of pizza. Ms. Newbern stated that although the Defendant bought pizza at the market multiple times per week, none of these pizzas had been burned. Likewise, Mr. Miller, who found the victim after the shooting, did not smell a burned pizza when he entered the market.

The Defendant and Mr. Jones were friends, and the men lived in the same neighborhood, borrowed each other's cars, and "hung out" daily. Mr. Jones's brothers, Mr. Thompson and Mr. Hall, were likewise friends with the Defendant. The detectives obtained a photograph from Mr. Jones's cell phone, which had been taken between March and May 2015 and which depicted Mr. Jones, Mr. Jones's young son, Mr. Thompson, and Mr. Hall. The photographs of Ms. Newbern's green Honda and of the Defendant and Mr. Jones standing on a driveway were also obtained from Mr. Jones's cell phone. Ms. Newbern testified that Mr. Jones and Mr. Thompson attended her son's birthday party a couple of days after the shooting, and the Defendant admitted speaking to Mr. Jones after the shooting.

We conclude that the evidence is sufficient to support the Defendant's convictions for criminal responsibility for the conduct of Mr. Jones and Mr. Hall. The evidence in the light most favorable to the State supports that the Defendant knowingly and voluntarily shared in the criminal intent of the crimes and promoted their commission. The Defendant, along with Mr. Thompson, drove to the market on the night of the shooting. Mr. Thompson communicated with Mr. Jones, who was with Mr. Hall. The Defendant was present inside the market two minutes before Mr. Jones and Mr. Hall entered, and the Defendant's pizza order required the victim to leave the front counter, at which the victim and three cash registers were protected by bullet-resistant glass. The victim stood in the pizza preparation area, which was not protected by the glass, when Mr. Hall shot the victim and when Mr. Jones jumped on the front counter and removed money from one of the cash registers. The Defendant saw Mr. Jones and Mr. Hall enter and leave the market, and the Defendant communicated with Mr. Jones after the shooting. The Defendant and the men were close friends who "hung out" daily and borrowed each other's car. The Defendant admitted speaking to Mr. Jones after the shooting, and Mr. Thompson and Mr. Jones attended the Defendant's son's birthday party days after the shooting. The jury could have reasonably inferred from the Defendant's presence and actions at the market and from his companionship with Mr. Jones and Mr. Hall before and after the commission of the offenses that the Defendant acted with the intent to assist in the armed robbery, resulting in the victim's death. *See Dorantes*, 331 S.W.3d at 386;

-14-

*Maxey,* 898 S.W.2d at 757; *see also Watson*, 227 S.W.3d at 639. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE